J-A21007-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JOSHUA HUPPERTERZ | : | |
| Appellant | : | No. 1544 EDA 2019 |

Appeal from the Judgment of Sentence Entered January 17, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010217-2017

BEFORE: LAZARUS, J., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY LAZARUS, J.:               **FILED NOVEMBER 13, 2020**

Joshua Hupperterz appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after a jury convicted him of first-degree murder,[1] possession of an instrument of crime (PIC),[2] abuse of a corpse,[3] and tampering with physical evidence.[4]  After careful review, we affirm.

The relevant facts of this case are as follows:

> On August 30, 2017, Joseph Burleigh received a phone call from his daughter, the victim, Jenna Burleigh, because she had gotten into a small car accident on Temple University's campus.  Ms.

---

[1] 18 Pa.C.S.A. § 2502(a).

[2] 18 Pa.C.S.A. § 907(a).

[3] 18 Pa.C.S.A. § 5510.

[4] 18 Pa.C.S.A. § 4910.

Burleigh had just started her first week of classes at Temple, and was attending as a commuter student. Mr. Burleigh met his daughter on campus and called for AAA assistance. Because she had an early class the next day, Ms. Burleigh decided to stay at Temple and sleep at her friend Davis Trinh's home near campus. Once AAA arrived, Mr. Burleigh said goodbye to his daughter and went home.

That evening, Ms. Burleigh, Mr. Trinh, and Mr. Trinh's roommates went to a few bars on or near Temple's campus, their last stop being the bar, Pub Webb. Mr. Trinh had one drink and then left the bar sometime before 12:00 [a.m.], but Ms. Burleigh stayed. Ms. Burleigh then met [Hupperterz], who was also at the bar that night. The two talked and eventually left the bar together when it closed for the evening at 2:00 [a.m.]. [At approximately 4:00 a.m., Hupperterz's neighbor heard a woman's loud screams coming from the vicinity of his apartment.[5]]

Soon after Ms. Burleigh left the bar with [Hupperterz], Mr. Trinh woke up at his home and saw that Ms. Burleigh had sent him multiple text messages[] seeking his help. Mr. Trinh messaged her back and called her multiple times, but Ms. Burleigh did not answer. Mr. Trinh then reached out to other friends of Ms. Burleigh, but no one was able to get in[] contact with her. Therefore, during the early hours of August 31, 2017, the friends searched for Ms. Burleigh on and around Temple's campus. When they were unable to locate her, they called her parents. Ms. Burleigh's parents were also unable to get into contact with their daughter, so they contacted the Temple University Police Department and filed a missing person's report.

[Hupperterz's roommate, Jack Miley, who had been out with Hupperterz the previous evening and consumed Xanax, marijuana, and alcohol before passing out drunk, slept through the night and woke up in the early afternoon to find Hupperterz cleaning blood off the floor of their kitchen, which Hupperterz claimed was a result of him falling in a bush. Mr. Miley ran some errands and returned home to find Hupperterz gone. [Mr. Miley's] sisters then arrived and he gave them free reign of the apartment, although Hupperterz [had previously] told him not to enter his

_____

[5] N.T. Trial, 1/8/19, at 214-15.

bedroom. Mr. Miley left that evening with his sisters to stay with their family in Long Island for Labor Day weekend. Despite Mr. Miley being on vacation, when he called Hupperterz after leaving for Long Island, Hupperterz claimed to be in North Carolina.[6]

Temple police immediately began an investigation into Ms. Burleigh's whereabouts. Detectives determined that Ms. Burleigh did not attend her scheduled class that day, and did not appear to have even been on campus that day. Moreover, a check of area hospitals for Ms. Burleigh was also unsuccessful. Detectives did, however, discover from employees of Pub Webb[] that[,] on the previous evening, Ms. Burleigh had left the bar with [Hupperterz]. Therefore, Captain Edward Woltemate of the Temple University Police Department called [Hupperterz] at approximately 5:15 [p.m.] to inquire about Ms. Burleigh's whereabouts. [Hupperterz] did not immediately answer, but did call the captain back at approximately 11:15 [p.m.], telling the captain that he had no recollection of the previous evening because he [drank $200 worth of shots]. The next morning, Captain Woltemate called [Hupperterz] again to see if [he] could assist police in determining Ms. Burleigh's path of travel on the night in question, but [Hupperterz] did not answer. Therefore, the captain and one of his detectives, Nicholas Chachula, went to [Hupperterz's] apartment building to see if anyone in the area had seen Ms. Burleigh. A resident of the building recognized [Hupperterz'] photograph and indicated that [Hupperterz] lived in apartment 1-R. The captain again called [Hupperterz's] phone multiple times in an attempt to gain entry into the apartment, but [Hupperterz] did not answer. Therefore, the captain and Detective Chachula obtained a key from the [] landlord and entered [Hupperterz's] apartment to see if Ms. Burleigh was inside; however, they were unable to locate her.

At approximately 4:10 [p.m.] that same day, [Hupperterz] returned Captain Woltemate's calls and told the captain that he had just woken up for the day and was in South Philadelphia, but that he would leave to meet the captain at Temple. [Hupperterz], however, never went to Temple to meet the captain. Rather, [Hupperterz] was actually in [N]ortheastern Pennsylvania at his grandmother's home, after taking a Lyft there earlier in the day.

---

[6] *See* N.T. Trial, 1/8/19, at 131-39, 150-60, 179-83, 207-16.

[Hupperterz] brought with him a large plastic tote [and asked the Lyft driver, Avery Tucker, to cancel his trip on the mobile app so that he could pay in cash.[7]]

In addition to Temple University Police, the FBI and the Philadelphia Police were also working to locate Ms. Burleigh. During the early evening hours of September 1, 2017, an FBI agent contacted the Pennsylvania State Police at Dunmore Barracks, located in Northeastern Pennsylvania, to request their assistance in the investigation. Corporal Benjamin Clarke was instructed to go and see if he could make contact with [Hupperterz] at his grandmother's house. When Corporal Clarke went to the residence, he met [Hupperterz] and his grandmother, Inez Stabilito. [Hupperterz] told the corporal that he was visiting his grandmother's house because he was about to start a heavy course[-]load that fall semester at Temple, and denied having any information about Ms. Burleigh. The corporal noticed, however, that [Hupperterz] had wounds to his hand and scratches on his neck. [Hupperterz] explained that he must have hurt his hand when he had broken a cereal bowl after drinking heavily on the night in question and that he was scratched during a sexual encounter earlier in the week. The corporal thereafter asked [Hupperterz] to go to the Dunmore Barracks in order to continue their conversation and so that pictures could be taken of [the] injuries. [Hupperterz] agreed and drove to the barracks with his grandmother. While at the barracks, [Hupperterz] was met by detectives from the Philadelphia Police Department and was transported back to Philadelphia.

[Also on the evening of September 1, Philadelphia Police officers executed a warrant to search Hupperterz's apartment for evidence pertaining to Ms. Burleigh's disappearance. In the trash behind the apartment, officers found a shirt Ms. Burleigh was known to own, a large blue sweatshirt similar to the one Ms. Burleigh's father had seen her wearing on the night before her disappearance, and a sports bra. Blood belonging to Ms. Burleigh and [Hupperterz] was splattered throughout the apartment, including [Hupperterz's] blood on the blade of a kitchen knife. None of the blood or the DNA in this area could be attributed to Jack Miley.]

_____

[7] **See** N.T. Trial, 1/9/19, at 108-10.

The next day, on September 2, 2017, [Hupperterz's] grandfather, George Stabilito, was tending to his wife's property. While he was working, he went down to the lake near the home and entered a shed to check for snakes. In the shed, Mr. Stabilito immediately noticed a very large blue tote, which he had never before seen. He opened the tote and saw that a body was inside of it. Pennsylvania State Police were contacted and responded to the scene, finding Ms. Burleigh's nude corpse in the tote.

An autopsy was performed and it was determined by the Philadelphia Medical Examiner that Ms. Burleigh's cause of death was strangulation. It was also discovered that Ms. Burleigh suffered injuries consistent with being struck by a fist, bitten, stabbed, and hit in the head with a foreign object. In addition, vaginal and rectal swabs were taken from Ms. Burleigh's body, and sperm containing [Hupperterz's] DNA was found in both areas of her body. Moreover, [Hupperterz's] DNA was also found in fingernail clippings taken from [her] body.

Trial Court Opinion, 8/7/19, at 3-7 (internal citations omitted).

Following a nine-day trial, a jury found Hupperterz guilty of the above-stated crimes, based on what the trial court described as "overwhelming evidence." *See id.* at 38-41. Immediately thereafter, the trial court imposed a mandatory sentence of life imprisonment for first-degree murder, plus consecutive terms of two-and-one-half to five years' imprisonment for PIC, one to two years' imprisonment for abuse of a corpse, and one to two years' imprisonment for tampering with physical evidence. Hupperterz filed post-sentence motions, which were denied, followed by a timely notice of appeal. Both Hupperterz and the trial court complied with Pa.R.A.P. 1925. Hupperterz raises the following issues for our review:

1. Did the [trial c]ourt err by denying [] Hupperterz's motion to suppress the searches and search warrants?[8]

2. Whether the court erred in denying [] Hupperterz's motion to suppress the [evidence] discovered as a direct result of the statements made in violation of his Fifth Amendment and corresponding state rights.

3. Whether the court erred in [denying Hupperterz the right to present evidence of Jack Miley's history of violence.[9]]

4. Whether the Court erred in allowing the Commonwealth to . . . present extrinsic evidence of [Jack] Miley's sleeping behavior, which had not been previously made available to [] Hupperterz.[10]

5. Whether the court erred with respect to the testimony of Dr. [Kenneth] Levy as follows:

   a. [I]n limiting the testimony of [D]r. Levy and his ability to rebut the extrinsic evidence of [Jack] Miley's substance use and sleeping;

---

[8] Hupperterz preserved this issue for our review by filing a pre-trial motion to suppress the evidence wherein he challenged the legality of three separate searches.

[9] Hupperterz also purported to raise an issue regarding the trial court's "admission of hearsay and substantive statements on the phone and text records of [Jack] Miley and [] Hupperterz," **see** Brief of Appellant at 7, but includes no discussion thereof in his appellate brief. Thus, we are unable address the issue, which appears to have been abandoned. **See Commonwealth v. Spotz**, 18 A.3d 244, 323 (Pa. 2011) (claims and sub-claims that are undeveloped are unreviewable and are accordingly waived).

[10] Similarly, Hupperterz waived his argument that the trial court erred in "allowing the Commonwealth to present the evidence of Dr. [Sam] Guilino, a secondary medical examiner, as his report was presented to [] Hupperterz just before trial and included different opinions from the original medical examiner's report," where he raised the issue in his statement of questions involved but included no discussion thereof in his appellate brief. **See Spotz**, **supra**.

b. [B]y denying [] Hupperterz's motion for a mistrial after the Commonwealth exceeded the order of the court limiting the scope of Dr. Levy's testimony and for denying [] Hupperterz the ability to illicit testimony beyond the limitation in response.

6. Whether the court further erred in allowing the Commonwealth to present inflammatory photographs in order to prove the charges [] Hupperterz was not allowed to plead guilty to.

7. Whether the court erred in denying [] Hupperterz's **_Batson_**[11] challenge after the Commonwealth used 4 of its 5 strikes on African American jurors.

Brief of Appellant, at 7-9 (unnecessary capitalization omitted; reordered for ease of disposition).

In his first two issues on appeal, Hupperterz claims that the trial court violated his Fourth Amendment rights by admitting evidence arising from: (1) Captain Woltemate's September 1, 2017, warrantless search of his apartment; (2) the subsequent search of Hupperterz's apartment that night pursuant to a warrant; and (3) the warrantless search of Hupperterz's cell-site data. **_See_** Brief of Appellant, at 20-64. Hupperterz similarly argues that

---

[11] **_Batson v. Kentucky_**, 476 U.S. 79 (1986) (prosecutors may not use peremptory challenges to dismiss jurors in criminal case solely based on their race).

the trial court violated his Fifth Amendment rights by admitting evidence discovered as a result of a *Miranda*[12] violation.  We disagree.[13]

When reviewing a suppression court's determination in favor of the Commonwealth, we must consider the evidence presented by the prosecution's witnesses and the evidence for the defense that, when fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Perez*, 845 A.2d 779, 788 (Pa. 2004); *Commonwealth v. Hughes*, 555 A.2d 1264, 1272 (Pa. 1989).  When determining whether a fact was supported, the suppression record must be viewed in the light most favorable to the Commonwealth as the motion winner. *Commonwealth v. Carter*, 779 A.2d 591, 594 (Pa. Super. 2001).  When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.  *Perez*, *supra* at 788. Where an appeal turns on allegations of legal error, "the suppression court's

_____

[12] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[13] In his appellate brief, Hupperterz also attempts to rely on Article I, Sections 8 and 9 of the Pennsylvania Constitution to support these first two issues. Although he made passing reference to Article I, Sections 8 and 9 before the trial court, Hupperterz did not distinguish between these sections and the Fourth and Fifth Amendments, respectively, in his appellate brief, much less provide any analysis of why a departure might be justified. Therefore, no state constitutional claims have been preserved for review.  *See Commonwealth v. Bishop*, 217 A.3d 833, 841-42 (Pa. 2019) (because defendant did not distinguish between Fifth Amendment and parallel provision in State Constitution, claim favoring departure from federal jurisprudence waived on appeal).

legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review." ***Commonwealth v. Jones***, 121 A.3d 524, 526-27 (Pa. Super. 2015) (internal citations, brackets, and quotation marks omitted).

Hupperterz first claims that the suppression court erred in determining that Captain Woltemate's warrantless search of his apartment was lawful under the exigent circumstances exception to the warrant requirement. Under this exception, a warrantless entry into one's home may be lawful if it is justified by both probable cause and exigent circumstances. ***See Commonwealth v. Bostick***, 958 A.2d 543 (Pa. Super. 2008). "Exigent circumstances arise where the need for prompt police action is imperative, either because evidence is likely to be destroyed . . . or because there exists a threat of physical harm to police officers or other innocent individuals." ***Commonwealth v. Steward***, 740 A.2d 712, 717 (Pa. Super. 1999). Police action is deemed imperative is where officers have an objectively reasonable basis to believe that someone within a residence is in danger or in need of medical assistance or immediate aid. ***See Commonwealth v. Galvin***, 985 A.2d 783 (Pa. 2009); ***Commonwealth v. Potts***, 73 A.3d 1275 (Pa. Super. 2013).

Instantly, the evidence adduced at the suppression hearing established that Captain Woltemate had probable cause to enter the apartment and did

so under exigent circumstances, having an objectively reasonable basis for believing that Ms. Burleigh was inside the apartment in danger or in need of medical assistance.

Captain Woltemate testified that on August 31, 2017, at approximately 5:15 p.m., he called Hupperterz after learning that Hupperterz was captured on video leaving Pub Webb with Ms. Burleigh, heading towards his apartment, the previous night. Hupperterz did not return the captain's phone call until approximately 11:15 p.m. and explained that he had no recollection of that evening because he was "so intoxicated." N.T. Hearing, 11/19/18, at 56-61. Captain Woltemate told Hupperterz to be available to meet the following day and asked Hupperterz for his address; Hupperterz gave the address of 1608 North 16th Street. *Id.* The next day, when no one at that address recognized Hupperterz, Captain Woltemate discovered that Hupperterz had given the wrong address and that he actually lived at 1708 North 16th Street. *Id.* at 64-65. A resident at that address directed Captain Woltemate to Hupperterz's apartment.

After knocking on the door and calling Hupperterz multiple times to no avail, Captain Woltemate searched the common areas of the building, including the basement, for any area where a human being could fit, but did not find Ms. Burleigh. *Id.* at 67-70. The captain explained that at this point, he was concerned about Ms. Burleigh's wellbeing: in addition to the fact that Hupperterz was being evasive with police, Ms. Burleigh had been missing for

approximately thirty-six hours, having missed her scheduled classes, and was last seen leaving a bar with Hupperterz in an intoxicated state after texting her friend for help. *Id.* at 70-74. Because Hupperterz could not recall leaving the bar with Ms. Burleigh, the captain surmised that she could likely be somewhere in his apartment without his knowledge, suffering from alcohol poisoning or otherwise in need of medical aid. *Id.* at 74-76. Indeed, Captain Woltemate has ten years of experience as a police officer on a college campus and is familiar with the behavior of its young students, including the frequency with which students intoxicate themselves to the point of being in imminent danger. *Id.* at 74. Due to these concerns, the captain retrieved a key from Hupperterz's landlord, knocked and announced his presence, and then entered the apartment, searching only those areas where a human body could be located. *Id.* at 74-76.

The record establishes that Captain Woltemate had ample reason to believe that Ms. Burleigh was inside Hupperterz's apartment and in danger at the time of the warrantless search. Therefore, the court did not err in concluding that the warrantless entry and limited search of Hupperterz's apartment to see if Ms. Burleigh was located inside and in need of medical assistance was lawful under the exigent circumstances exception to the warrant requirement. *See Commonwealth v. Miller*, 724 A.2d 895 (Pa. 1999) (warrantless search upheld based on exigent circumstances where appellant's history of drug use created reasonable belief appellant and wife

were inside residence and in need of assistance); ***Commonwealth v. Silo***, 502 A.2d 173 (Pa. 1985) (exigent circumstances supported warrantless search of home where victim was last seen arguing with appellant, had not been seen or spoken to for twenty four hours, and did not report for work).

Next, Hupperterz argues that the suppression court erred in admitting evidence recovered from the subsequent search of his apartment, conducted pursuant to a search warrant, in that the warrant was invalid and the search was impermissibly conducted at night. More specifically, Hupperterz claims that the warrant contained material omissions or misrepresentations where the affiant, Detective Terrance Sweeney of the Philadelphia Police Department, omitted from the affidavit of probable cause that earlier in the day on September 1, 2017, Captain Woltemate of the Temple University Police had entered and searched Hupperterz's apartment for Ms. Burleigh but was unable to locate her.

A defendant may challenge the validity of a warrant based on false statements and omissions in the affidavit. ***See Franks v. Delaware***, 438 U.S. 154 (1978). The suppression court must conduct a ***Franks*** hearing "where the defendant makes a preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit." ***Commonwealth v. James***, 69 A.3d 180, 188 (Pa. 2013). The burden is on the defendant to provide allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be

accompanied by an offer of proof. *Franks*, *supra* at 171. If the defendant meets this burden, then the affidavit's false material is disregarded; however, the search warrant will only be voided, and the fruits thereof excluded, where the remaining content is insufficient to establish probable cause. *James*, *supra* at 188.

At the *Franks* hearing, Detective Sweeney of the Philadelphia Police Department testified that when he prepared the affidavit on the evening of September 1, 2017, he was not personally aware that Captain Woltemate of the Temple University Police had already searched Hupperterz's apartment for a missing person. N.T. Hearing, 11/21/18, at 21-22. While Detective Sweeney did include in the affidavit some of the information from Temple's investigation into Ms. Burleigh's disappearance—including that video surveillance captured Ms. Burleigh leaving Pub Webb with Hupperterz, Ms. Burleigh had texted her friend for help when she was with Hupperterz, Hupperterz's neighbor reported that she heard "scared and painful" screams around 4 a.m., and Hupperterz sustained an injury to his hand—he testified that this information came from members of his own department rather than directly from Temple University police. *Id.* at 23-25, 51. Because the court found this testimony credible, *see* N.T. Hearing, 12/7/18, at 62-64, Hupperterz failed to prove that the detective deliberately or recklessly omitted information from the warrant. *Franks*, *supra*.

Moreover, even if Detective Sweeney had been aware of and referred to the prior entry into Hupperterz's apartment to search for Ms. Burleigh in the affidavit, it would not have negated or destroyed probable cause. Whereas Captain Woltemate performed only a cursory search of the apartment for Ms. Burleigh's person, Detective Sweeney sought to perform a more detailed search to locate any evidence that could reveal her whereabouts in order to ensure her safety. Accordingly, the court did not err in denying Hupperterz's **Franks** motion and admitting the evidence seized during that search.

We also reject Hupperterz's contention that the search warrant was impermissibly executed at night. **See** Brief of Appellant, at 49-51. "Put simply, the affidavit for a warrant authorizing a nighttime search must show both probable cause and some reason why the search cannot wait until morning." **Commonwealth v. Bowmaster**, 101 A.3d 789, 793-94 (Pa. Super. 2014) (internal citations omitted); **see also** Pa.R.Crim.P. 203(E) ("No search warrant shall authorize a nighttime search unless the affidavits show reasonable cause for such nighttime search.").[14]

_____

[14] Although we have recognized that "the fact that an entry is made at night raises particular concern over its reasonableness ... and may elevate the degree of probable cause required," **Bowmaster**, **supra** at 793, our Supreme Court has held that "[t]his enhanced burden on an individual's privacy [] is not implicated when[, as here], the subject is in police custody" at the time of the search. **Commonwealth v. Johnson**, 160 A.3d 127, 142 (Pa. Super. 2017).

Here, the affidavit of probable cause contained sufficient information to justify a nighttime search of Hupperterz's apartment where: Detective Sweeney explained that Ms. Burleigh had been missing for nearly 48 hours, and was last seen heading there with Hupperterz in an intoxicated state after messaging Davis Trinh for help; Hupperterz's neighbor heard "a female screaming in a very scared, painful manner" at 4:00 a.m. on the night of Ms. Burleigh's disappearance; and Hupperterz had cuts on his hand, refused to cooperate with police, and was found by police at his grandmothers house in northeast Pennsylvania despite telling Captain Woltemate he was in Philadelphia. **See** Application For Search Warrant 204475. Based on the foregoing, it is apparent that with each hour that passed, Ms. Burleigh was in likely greater danger. Accordingly, it is clear from the record that a nighttime search was appropriate, since time was of the essence in locating her. **See Commonwealth v. Camperson**, 650 A.2d 65, 70 (Pa. Super. 1994) (nighttime search appropriate where search cannot wait until morning). Thus, the trial court did not err in declining to suppress the evidence from the September 1, 2017 nighttime search.

Hupperterz next claims that the suppression court erred in finding that the warrantless search of his cell site records was lawful under the exigent circumstances exception. This claim is without merit.

The United States Supreme Court held in **Carpenter v. U.S.**, 138 S.Ct. 2206 (2018), that the acquisition of cell-site location information (CSLI)

constitutes a search under the Fourth Amendment. *Id.* at 2220. The Court specifically recognized, however, that the exigent circumstances requirement could justify the warrantless acquisition of CSLI. *Id.* at 2223 ("the rule we set forth does not limit the[ police's] ability to respond to an ongoing emergency. . . . [I]f law enforcement is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of CSLI").

Here, for the reasons discussed previously, exigent circumstances existed to support the immediate seizure of Hupperterz's CLSI; the last contact anyone had with Ms. Burleigh was when she texted Davis Trinh for help, and by the time police requested Hupperterz's CSLI, police knew that Ms. Burleigh had also messaged a different friend on Instagram for help. N.T. Hearing, 11/21/18, at 24, 56-57. She had not gone to class, been seen on campus, or answered any calls or texts, which her parents described as very unusual. *Id.* at 57-64. Detective Sweeney knew that Ms. Burleigh had last been seen leaving Pub Webb with Hupperterz, that a neighbor of his heard a female screaming early in the morning near his apartment, and that he was evading the police. *Id.* at 8, 23-27. Detective Sweeney initially thought to track Ms. Burleigh's CSLI, but discovered that her phone had been inactive since the early morning hours of August 31, 2017. *Id.* at 7-8. Detective Sweeney testified that the arduous process for obtaining a search warrant for CSLI could take up to three weeks, and that by obtaining Hupperterz's CSLI immediately, he was able to track his movements between cell towers in real

time to aid in finding him and, through him, Ms. Burleigh. *Id.* Detective Sweeney testified unequivocally that he believed time was of the essence in finding Ms. Burleigh, especially if she did in fact require medical assistance. *Id.* at 10. Accordingly, the court did not err in finding that the warrantless acquisition of Hupperterz's CSLI was lawful under the exigent circumstances exception. *Carpenter*, *supra*.

Next, Hupperterz claims that the suppression court erred in denying his motion to suppress the evidence discovered as a result of a statement he made to a Philadelphia police detective in violation of *Miranda*. He is entitled to no relief.

The fruit of the poisonous tree doctrine provides that evidence obtained by police as a result of an unconstitutional search may not be used against the subject of the search. *See Wong Sun v. U.S.*, 371 U.S. 471 (1963). The Pennsylvania Supreme Court explained that evidence discovered as a result of a *Miranda* violation must similarly be suppressed. *See Commonwealth v. Lukach*, 195 A.3d 176, 193 (Pa. 2018). To determine whether evidence must be excluded as fruit of a poisonous tree, courts must consider "whether, [given] the primary illegality, the evidence to which instant objection is made [was obtained] by exploit[ing] that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, *supra*, at 488 (citation and internal quotation marks omitted). The inevitable discovery rule, also known as the independent source rule, provides an exception for the fruit

of the poisonous tree doctrine, allowing evidence to come in where the "prosecution [] demonstrate[s] that the evidence in question was procured from an independent origin." *Commonwealth v. Melendez*, 676 A.2d 226, 230 (Pa. 1996).

Instantly, Hupperterz filed a pre-trial motion to suppress statements he made to Detective Joseph Murray of the Philadelphia Police Homicide Unit on September 2, 2017, specifically: (1) that he received medical aid from Matthew Montagna at an Urgent Care; (2) that his cousin, Erick Carlson, helped him move a tote bag with Ms. Burleigh's body in it to his mother's house in Jenkintown; and (3) that he paid a Lyft driver, Avery Tucker, to drive him with the tote from Jenkintown to his grandmother's house in Northeast Pennsylvania. Brief of Appellant, at 108-14. The Commonwealth conceded that the statements were taken in violation of Hupperterz's *Miranda* rights where, after being advised of those rights, Hupperterz requested an attorney and was told "that's not going to happen." N.T. Hearing, 12/3/18, at 50. Accordingly, the trial court suppressed the statements. However, the parties stipulated "that the statement to Detective [] Murray in its entirety is not . . . coerced," *id.* at 50-51, and the parties agreed with the court that, under *Commonwealth v. Hess*, 666 A.2d 705 (Pa. Super. 1995), the exclusionary rule would not apply to the fruits of anything discovered through the statement taken in violation of *Miranda*. N.T. Hearing, 12/17/18, at 39.

At the time of the ruling, neither the parties nor the court was aware that our Supreme Court had recently held in **Lukach**, **supra**, that a statement taken after a defendant invokes his **Miranda** rights is presumed to be coerced, and therefore, any fruits discovered as a result of that statement should also be suppressed. **See id.** at 193. Presently, Hupperterz argues that, in light of **Lukach**, the suppression court erred by admitting the testimony of Matthew Montagna, Erick Carlson, and Avery Tucker. Brief of Appellant, at 118-25. However, he is entitled to no relief, because the Commonwealth established at the suppression hearing that it either had an independent source for the evidence or would have inevitably discovered it. **See Wong Sun**, **supra**; **see also Commonwealth v. Fulton**, 179 A.3d 475, 489-90 (Pa. 2018) (fruit of poisonous tree may be used against defendant where prosecution establishes by preponderance of evidence that police obtained knowledge of evidence from independent source or illegally-obtained evidence would have inevitably been discovered by legal means).

First, the Commonwealth established by a preponderance of the evidence that it had an independent source for discovering Avery Tucker, the Lyft driver who transported Hupperterz and Ms. Burleigh's body. At the suppression hearing, Philadelphia Police Detective Edward Keppol testified

that at approximately 8:00 a.m.[15] on the morning of September 2, 2017, Hupperterz's stepfather informed detectives that Hupperterz had taken a Lyft from Jenkintown to upstate Pennsylvania. N.T. Hearing, 12/17/18, at 12-14, 18. Detective Keppol then contacted Lyft's security department, who confirmed that Hupperterz did make a trip from Jenkintown to Hawley, Pennsylvania, and put the detectives in contact with Tucker. *Id.* at 13.

Next, the Commonwealth established that it had an independent source for discovering Matthew Montagna who treated Hupperterz at an Urgent Care for a hand injury sustained on the night of Ms. Burleigh's disappearance. During the nighttime search of Hupperterz's apartment for evidence that could establish Ms. Burleigh's whereabouts, executed the night before the interview, police recovered paperwork from the Urgent Care which led to the discovery of Montagna. *Id.* at 9-10. In addition, the Commonwealth obtained text messages between Hupperterz and Montagna discussing Hupperterz's hand injury and the address of the Urgent Care, which were discovered through an extraction of Hupperterz's phone which the defense provided to the Commonwealth. *Id.* at 20, 30-32.

Lastly, as to Erick Carlson, who unknowingly helped Hupperterz transport the tote with Ms. Burleigh's body from Philadelphia to Jenkintown,

---

[15] Detective Murray did not interview Hupperterz until a few hours later, at approximately 10:49 a.m. on September 2, 2017. N.T. Hearing, 12/17/18, at 18.

the Commonwealth established that it would have inevitably discovered him regardless of Hupperterz's statements to Detective Murray. At the suppression hearing, the Commonwealth explained that it possessed video surveillance footage of Carlson at Hupperterz's apartment transporting the tote. *Id.* at 35-36. In addition, the Commonwealth obtained text messages between Carlson and Hupperterz corroborating what was caught on video, which were also discovered through an extraction of Hupperterz's phone provided by the defense to the Commonwealth. *Id.* at 36-37.

Accordingly, because the Commonwealth established that it had independent sources for or would have inevitably discovered the identities of Tucker, Montagna, and Carlson, the court properly denied Hupperterz's motion to suppress the fruits of his suppressed statement. *Wong Sun*, *supra*; *Fulton*, *supra*.

In his third, fourth, fifth, and sixth issues, Hupperterz challenges several evidentiary rulings by the trial court. No relief is due.

> It is well-settled that:
>
> In reviewing a trial court's ruling on the admissibility of evidence, our standard of review is one of deference. Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and its discretion will not be reversed absent a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill[-]will or partiality, as shown by the evidence of record. Furthermore, if in reaching a conclusion the trial court [overrides] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Thompson*, 106 A.3d 742, 754 (Pa. Super. 2014) (internal citations and quotation marks omitted).

Hupperterz first claims that the trial court erred in prohibiting him from presenting evidence that his roommate, Jack Miley, allegedly punched a man in a 7-Eleven when he was intoxicated. This claim is meritless.

"The admission of prior bad acts is within the discretion of the trial court and will only be reversed upon a showing of abuse of discretion." *Commonwealth v. Chimel*, 889 A.2d 501, 534 (Pa. 2005). "Evidence of prior bad acts is inadmissible to prove character or to show conduct in conformity with that character." *Commonwealth v. Weiss*, 81 A.3d 767, 798 (Pa. 2013); *see also* Pa.R.E. 404(a)(1) (same). However, this evidence is admissible "when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, identity, or absence of mistake or accident." *Weiss*, *supra* at 798; *see also* Pa.R.E. 404(b)(2) (same).

Here, Hupperterz sought to introduce evidence in the form of a text message that he himself had sent to Miley, telling Miley what he had allegedly done when he had "blacked-out" while drinking. *See* N.T. Trial, 1/10/19, at 8-9. Hupperterz offered this evidence to show that it was Miley who strangled Ms. Burleigh to death when he was intoxicated. He submits that he was entitled to "offer some evidence that [Miley] committed a similar crime [to the murder] at or around the same time [he allegedly] committed [the murder]." *See Commonwealth v. Palagonia*, 868 A.2d 1212, 1216 (Pa. Super. 2005).

To admit this evidence, Hupperterz was required to establish the relevance and probative value by reference to "the lapse of time between the commission of the two crimes[] and [] the resemblance between the methodologies of the two crimes." *Id.* The evidence is not admissible unless the nature of the crime is "so distinctive and unusual as to be like a signature or the handiwork of the same individual." *Id.* (citations and internal quotation marks omitted).

The trial court properly concluded that here, there was no distinct nature or methodology to the alleged assault at 7-Eleven and the gruesome murder of Ms. Burleigh such that it would be relevant to prove Miley was the assailant in this case. *Cf. Commonwealth v. Smith*, 467 A.2d 1120 (Pa. 1983) (admitting, at trial for robbery and homicide, evidence of defendant's robbery-homicide several months prior as part of common plan, given "striking similarities between the two crimes" where both murders involved older males from West Virginia who had relationship with defendant, both victims' bodies were found in remote area of Pennsylvania, and evidence refuted argument that defendant was incapable of committing crime without aid of male partner); *Commonwealth v. Thompson*, 799 A.2d 1195, 1203 n.4 (Pa. Super. 2001) (driver's "pattern of cocaine trafficking . . . **not just any single isolated incident**" was admissible to prove driver, and not defendant/passenger, constructively possessed cocaine found in backseat of car) (emphasis added).

Because Hupperterz sought to introduce a single isolated incident of Miley's alleged past violent act was completely dissimilar to the crime at issue, the court did not err in precluding Hupperterz from introducing such evidence as demonstrating a common plan or scheme. *See Commonwealth v. Johnson*, 160 A.3d 127, 143 (Pa. 2017) (previously selling heroin in baggies marked "#1 way to go" not admissible as signature crime in case where identical baggies were found); *Palagonia*, *supra* (prior burglary not sufficiently similar to burglary at issue where former involved tools and latter did not involve forced entry); *Commonwealth v. Nocero*, 582 A.2d 376 (Pa. Super. 1990) (for purposes of admitting evidence of prior bad acts to establish identity of person involved in disconnecting water line from base of water fountain, act of ripping water fountain from base was not unique type of vandalism such that jury could infer same person did both acts).

Hupperterz next argues that the trial court erred in allowing the Commonwealth to present extrinsic evidence of Miley's sleeping behavior. No relief is due.

The Rules of Evidence provide that all relevant evidence is admissible, except as otherwise provided by law. Pa.R.E. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. Relevant evidence may only be excluded where its probative value is outweighed by the danger of unfair prejudice, confusing the

issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Pa.R.E. 403.

At trial, the Commonwealth presented the testimony of Courtney Miley, Jack Miley's sister, regarding prior instances in which she observed Jack Miley sleeping through loud parties while he was under the influence of drugs and alcohol. *See* N.T. Trial, 1/11/19, at 174-79. Hupperterz objected to the proposed evidence, arguing that it was inadmissible character evidence under Rule 404(b), and that even if it were admissible, the Commonwealth did not provide advance notice that it intended to present such evidence, as required under that Rule. N.T. Trial, 1/10/19, at 10-14; *see also* Pa.R.E. 404(b)(3) ("In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecution intends to introduce at trial).

Primarily, we note that the evidence was highly relevant in that Hupperterz argued that "it would have been virtually impossible for [Jack Miley] not to have heard some of the evidence that we've already [discussed] . . . including screaming." N.T. Trial, 1/10/19, at 13. In fact, on cross-examination, defense counsel extensively questioned Mr. Miley about his sleep on the night in question. N.T. Trial, 1/11/19, at 42-47. Evidence of Jack Miley's inability to wake up from loud noises when under the influence of drugs and alcohol speaks to the probability that he woke up and murdered Ms.

Burleigh after passing out in his apartment following a night of drinking and consuming Xanax and marijuana. The evidence was not unfairly prejudicial, as it did not have "a tendency to suggest [a] decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially." ***Commonwealth v. Kane***, 188 A.3d 1217, 1228 (Pa. Super. 2018). Hupperterz does not argue that any other factors from Rule 403 outweighed its relevance.

Hupperterz attempts to categorize Courtney Miley's testimony as character evidence prohibited by Rule 404(b). However, as the trial court explained when overruling Hupperterz's objection, after hearing argument, the soundness with which one sleeps when intoxicated is not character evidence, but is instead evidence of an innate physical characteristic bearing on perception. N.T. Trial, 1/10/19, at 129-33; ***see also Commonwealth v. Hudson***, 414 A.2d 1381, 1385 (Pa. 1980) (witness's ability to perceive events due to "physical condition after consuming drugs is a matter of credibility to be considered by the jury."). Thus, the evidence did not fall within the confines of Rule 404(b), and the Commonwealth was not subject to the advance notice requirement of that Rule.[16] Accordingly, the court did not err by admitting this evidence.

---

[16] Nevertheless, the trial court, in fairness to Hupperterz, permitted defense counsel to interview both Jack and Courtney Miley outside the presence of the jury regarding these prior instances. N.T. Trial, 1/10/19, at 130.

- 26 -

Even if the court had erred by admitting this evidence, we conclude that Hupperterz is not entitled to relief, as any error was harmless beyond a reasonable doubt. *See Commonwealth v. King*, 234 A.3d 549 (where appellate court finds error harmless beyond reasonable doubt, losing party did not meet burden to reverse original decision).

> Harmless error occurs where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Burno*, 154 A.3d 764, 787 (Pa. 2017),

Here, the properly admitted and uncontradicted evidence of Hupperterz's guilt was so overwhelming, and any prejudicial effect of admitting the challenged evidence was so insignificant by comparison, that the alleged error could not have contributed to the verdict. Absent any proof that Jack Miley slept through loud noises when intoxicated, the evidence adduced at trial established, *inter alia*, that: the victim left Pub Webb with Hupperterz after persistently texting her friend for help; the two were seen together heading in the direction of Hupperterz's apartment; Hupperterz's neighbor heard piercing female screams coming from the vicinity of his apartment around 4:00 a.m.; Jack Miley awoke on the early afternoon the following day to find Hupperterz cleaning up blood in their kitchen; surveillance video captured Hupperterz at approximately 6:00 p.m. that

evening loading a large tote into a car; the following day, Hupperterz assured Captain Woltemate he was on his way to meet him on Temple's campus, but never appeared; that evening, Pennsylvania State Troopers found Hupperterz at his grandmother's house and observed cuts on his neck and hands; the day after that, Hupperterz's grandfather discovered Ms. Burleigh's naked corpse inside the tote bag in his shed; Hupperterz's DNA was found on the tote, under Ms. Burleigh's fingernails, and in her vagina, rectum, and mouth. Accordingly, no relief is warranted. ***King***, ***supra***; ***Burno***, ***supra***.

Next, Hupperterz claims that the trial court abused its discretion by limiting the testimony of his expert, Dr. Kenneth Levy, regarding the effects of certain intoxicants, and denying his motion for a mistrial on the theory that the Commonwealth exceeded that limitation. Again, we find that no relief is due. ***See Commonwealth v. Lopez***, 854 A.2d 465, 470 (Pa. 2004) (admission of expert testimony is matter of discretion for trial court and will not be remanded, overruled, or disturbed absent clear abuse of discretion).

On the final day of trial testimony, Hupperterz presented the trial court with a report from Dr. Levy, an expert psychiatrist, opining that an individual who consumes marijuana and Xanax, as Jack Miley did on the night of Ms. Burleigh's death, could experience a "blackout" (or amnesia) and could be "at risk for violent and maladaptive behavior[,] potentially suicidal and homicidal behavior." ***See*** Forensic Psychiatric Evaluation, Defense Exhibit D-12, 1/15/19. Hupperterz intended for this testimony to rebut the

Commonwealth's argument that Miley was unaware of the events surrounding Ms. Burleigh's death because he had slept through it, insinuating that the combination of intoxicants caused Miley to act violently and then forget his actions. N.T. Trial, 1/16/19, at 6-9. After reviewing the report, the trial court allowed Dr. Levy to testify as to potential memory loss, as this was a fair rebuttal to the Commonwealth's evidence that Miley had simply slept through the events in question. *Id.* at 119-21. However, the court barred Dr. Levy from testifying that imbibing a combination of intoxicants could make an unknown percentage of individuals potentially exhibit suicidal or homicidal behavior. *Id.*

> First, the [c]ourt noted that this portion of the proffered testimony was not responsive to any of the evidence that the Commonwealth had already presented. Moreover, since the report was not turned over until the eleventh hour of trial, the [c]ourt believed that it was [prejudicial] to the Commonwealth to admit this evidence without giving [it] time to prepare a meaningful response. Finally, **the negligible probative value of this evidence was far exceeded by the potential for unfair prejudice.** [Doctor Levy] never examined Mr. Miley, nor rendered an opinion that Mr. Miley had exhibited homicidal behavior on the night in question. Rather, he was simply offering to testify that in a certain [unknown] percentage of people, such behavior could [potentially] be exhibited. . . . *See* Pa.R.E. 403 ("The court may exclude relevant evidence if its probative value is out-weighed by a danger of . . . unfair prejudice, confusing the issues, or misleading the jury[.]").

Trial Court Opinion, at 8/7/19, at 29 (emphasis added).

The trial court properly limited Dr. Levy's testimony to that which the Commonwealth had already discussed at trial and precluded testimony on a new issue to which the Commonwealth would have had no meaningful opportunity to respond, especially where the probative value of the excluded

testimony was outweighed by the danger of unfair prejudice to the Commonwealth, confusing the issues, and misleading the jury.[17]   The trial court correctly ruled that the defense could not invite the jury to conclude Miley was the one who committed the murder simply by virtue of the fact that he took drugs which "can [] have the potential to place an individual at risk for violent and maladaptive behavior."  *See* Forensic Psychiatric Evaluation, Defense Exhibit D-12; *see also* Pa.R.E. 403; ***Commonwealth v. Montavo***, 653 A.2d 700, 705 (Pa. Super. 1995) (holding it improper to present expert testimony that defendant's travel to drug trafficking areas indicated involvement in selling narcotics).

Hupperterz also claims that the court erred in denying his motion for a mistrial after the Commonwealth allegedly exceeded the scope of the court's ruling on Dr. Levy's testimony.  This claim is without merit.

The award of a mistrial is an "extreme remedy" appropriate "only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial."  ***Commonwealth v. Manley***, 985 A.2d 256, 266 (Pa. Super. 2009).  Instantly, it is simply untrue that the Commonwealth

---

[17] The report, which appears to be written in a stream of consciousness, is difficult to follow due to errors in spelling and grammar.  *See* Forensic Psychiatric Evaluation, date, Exhibit D-12, 1/15/19.  It is unclear what Dr. Levy's conclusions are.  Based on the nature of the report alone, it was even more likely to confuse the jury and distract from the real issues in the case.

exceeded the scope of the court's ruling. Although the record reflects that the Commonwealth began to ask Dr. Levy for a general description of the possible effects that consuming intoxicants could have on someone, the trial court immediately interjected and prohibited the Commonwealth from asking this question.[18]  N.T. Trial, 1/16/19, at 171-72.  The Commonwealth then proceeded to question Dr. Levy regarding the effect those intoxicants would have specifically on the potential for memory loss or "blackouts," consistent with the court's previous ruling.  *Id.*  The Commonwealth's passing reference to the general effects that intoxicants could have on an individual, which resulted in no improper testimony from Dr. Levy, cannot reasonably be said to have prejudiced Hupperterz to the point of denying him a fair trial. Therefore, the court did not err in ruling that an award of a new trial is inappropriate.  *Manley*, *supra*.

_____

[18] The exchange proceeded as follows:

> [Prosecutor]:  I want to move on from the memory for a second. I just want to talk about these drugs in general.  Alcohol is a central nervous system depressant—
>
> The Court:  Listen, listen, before you do that, you just better understand the ruling that I made before the witness took the stand—
>
> [Prosecutor]:  Absolutely.
>
> The Court:  —if you're talking about the general effects now. Okay?  That's what you just said.

N.T. Trial, 1/16/19, at 171.

Next, Hupperterz claims that the court committed reversible error by allowing the jury to view two photographs of Ms. Burleigh's corpse: (1) photograph L38, which depicted Ms. Burleigh's body in the tote bag, in the exact position Hupperterz had forced it, after a blanket and clothing on top of her body were removed; and (2) photograph L39 depicting Ms. Burleigh's body after it had been removed from the tote before it was cleaned for medical examination photographs. Once again, no relief is due.

> When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:
>
> First, a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Johnson*, 42 A.3d 1017, 1033-34 (Pa. 2012); *see also* *Commonwealth v. Funk*, 29 A.3d 28, 33 (Pa. Super. 2011) (en banc) (photograph inflammatory if it is "so gruesome it would tend to cloud the jury's objective assessment" of defendant's guilt or innocence). The decision of whether to allow a potentially inflammatory photograph is within the sound discretion of the trial court and will not be overturned absent an abuse of discretion. *Commonwealth v. Gorby*, 588 A.2d 902, 908 (Pa. 1991).

Our Supreme Court explained in *Commonwealth v. McCutchen*, 454 A.2d 547 (Pa. 1982) that:

> To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the **essential functions of a criminal trial, inquiry into the intent of the actor.** There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.
>
> * * *
>
> **In assessing the intent of the actor in a case of criminal homicide**, be it to inflict serious bodily injury or to kill**, the fact finder** who deals in such an intangible inquiry **must be aided to every extent possible.**

*Id.* at 549.

In that case, our Supreme Court reversed this Court's ruling that certain photographic slides depicting the victim's body were inadmissible, because "they were offered in support of proof of the element of murder of the first degree of intent to kill, the general propriety of which is well established." *Id.* The Court held that images of the six-year-old victim's "splay[ed] . . . scalp," "extensive bruising of the . . . face" and torn anus were "essential as evidence of intent beyond mere infliction of bodily injury." *Id.* The Court further explained that the "essential nature of the evidence is further established by the absence of any evidence of intent aside from the condition of the body." *Id.* at 550.

Here, as in *McCutchen*, there were no eyewitnesses to the murder, and the only evidence of defendant's intent to kill was the condition of the victim's body. The trial court admitted both photographs as evidence supporting the

murder charge since the severity of the injuries demonstrated Hupperterz's intent to kill, rather than merely injure, his victim.

Hupperterz submits that photograph L38 was unnecessary in light of photograph L35, which showed Ms. Burleigh's body inside the tote covered by a blanket and clothing. This argument is meritless, however, because photograph L35 does **not** convey the state of Ms. Burleigh's covered body, whereas photograph L38 does. *See McCutchen supra* at 549 (in assessing intent of actor accused of first-degree murder, jury must be aided to every extent possible). The trial court also reasoned that photograph L38 "depicted the considerable efforts that Hupperterz undertook to conceal the victim's death, [] provid[ing] extremely probative evidence that [he] was the one who committed the murder. This was particularly compelling since [Hupperterz] claimed that it was not he who killed the victim, but rather, it was his roommate[.]". Trial Court Opinion, 8/7/19, at 34.

Similarly, the trial court reasoned that photograph L39, which depicted the extensive injuries inflicted upon Ms. Burleigh, including strangulation marks, scratches, and gashes, provided "essential evidentiary value to the severe beating suffered by the victim, and, therefore, of [Hupperterz's] intent to kill her. *Id.* Indeed, the trial court explained that:

> There's really nothing in any of these [medical examination] photos that show the overall constellation of [Ms. Burleigh's] different injuries. **And since the jury has to be convinced that he had specific intent to kill, [L]39 seems to be the only photo that would have an overall view showing the various**

**injuries** that she sustained on her face, her neck, and upper chest.

N.T. Hearing, 12/28/18, at 300 (emphasis added).

Furthermore, the trial court instructed the jury that it was not to allow the gruesome nature of the photographs to impact its decision in the case, further guarding against any unfair prejudice. N.T. Trial, 1/14/19, at 19-20. **See Commonwealth v. Pruitt**, 951 A.2d 307, 319 (Pa. 2008) (although possibility of inflaming passions of jury is not to be lightly dismissed, trial judge can minimize danger with appropriate instruction, warning jury members not to be swayed emotionally by disturbing images, but to view them only for their evidentiary value).

In light of the foregoing, the trial court did not err in admitting the two challenged photographs of Ms. Burleigh's lifeless body as evidence of Hupperterz's intent to kill her. **McCutchen**, **supra**; **Johnson**, **supra**.

Finally, Hupperterz claims that the trial court erred in denying his **Batson** challenge after the Commonwealth used four of its five peremptory strikes on African American jurors. This claim fails.

It is well-settled that "the government denies a defendant equal protection of the laws when it 'puts him on trial before a jury from which members of his race have been purposefully excluded.'" **Commonwealth v. Uderra**, 862 A.2d 74, 83 (Pa. 2004), quoting **Batson**, **supra** at 85. To succeed on a **Batson** claim of racial discrimination in jury selection:

[T]he defendant must [first] make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally[,] the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

\* \* \*

To establish a *prima facie* case under **Batson**, the defendant must prove that: he is a member of a cognizable racial or ethnic group; the State exercised its peremptory challenges to remove members of such group from the venire; and other relevant circumstances raise an inference that the State used peremptory challenges to exclude venirepersons from the same racial or ethnic group. . . . For example, the inference may derive from a pattern of strikes against minority jurors or from the manner of the prosecution's questions and statements during *voir dire* examination.

*Id.* at 83-84.

The second prong of the **Batson** test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, does not demand an explanation that is persuasive or even plausible. Rather, the issue at that stage is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reasons offered will be deemed race neutral.

If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test, *i.e.,* the ultimate determination of whether the opponent of the strike has carried his burden of proving purposeful discrimination. It is at this stage that the persuasiveness of the facially neutral explanation proffered by the Commonwealth is relevant.

*Commonwealth v. Roney*, 79 A.3d 595, 619 (Pa. 2013) (internal citations and quotation marks omitted).

Here, Hupperterz has failed to establish a *prima facie* case under **Batson** where the totality of the circumstances do not demonstrate that the Commonwealth used peremptory challenges on the basis of race. The jury pool consisted of sixty venirepersons, eighteen of whom were African American. Hupperterz, through counsel, raised a **Batson** motion after the Commonwealth's fifth peremptory challenge. N.T. Trial, 1/7/19, at 152. When counsel raised the **Batson** motion, he was unaware that Hupperterz was African American, and instead claimed Hupperterz was "part Hispanic." *Id.* at 156. Hupperterz thereafter informed defense counsel and the court that his great-grandfather was African American. *Id.*

While, by that point, the prosecutor had previously used four peremptory challenges, the Commonwealth had agreed to sit three African American venirepersons out of the eight jurors then selected. *Id.* at 154-57. The trial court, considering this data, and further noting that Hupperterz appears to be Caucasian and that the victim was Caucasian, found that Hupperterz had not established a *prima facie* case of purposeful discrimination. *Id.* at 157. We agree that the fact that the Commonwealth struck four African American venirepersons, after agreeing to sit three, does not prove a pattern of racial discrimination. *Cf. Holloway v. Horn*, 355 F.3d 707, 722 (3d. Cir. 2004) (pattern established where prosecutor used seven of eight strikes against African Americans).

Nevertheless, the court requested that the Commonwealth provide race-neutral explanations for its peremptory challenges, which were as follows: (1) prospective juror number 3 stated that he believes his brother was unfairly charged with murder in Philadelphia; (2) prospective juror number 16 was a white female;[19] (3) the prosecutor believed prospective juror number 18 was not going to take the case seriously because he said "what's up?" when first addressing the court and wore a shirt that said "Antisocial Social Club;" (4) the prosecutor doubted that prospective juror number 42, a corrections officer at a Philadelphia prison, would be able to set aside his familiarity with the criminal justice system when assessing the case; and (5) prospective juror number 47 was a lawyer who previously worked in criminal defense and explained that he would evaluate the case as an attorney as opposed to a layperson. N.T. Trial, 1/7/19, at 158-62. The trial court found each of these explanations to be credible, race-neutral explanations for the Commonwealth's peremptory challenges. *Id.* at 162. Thus, the trial court did not err in denying Hupperterz's *Batson* claim. *Uderra*, *supra*; *Roney*, *supra*; *see also Commonwealth v. Noel*, 104 A.3d 1156, 1159 n.1 (Pa. 2014) ("[A] peremptory challenge may be exercised for any [non-discriminatory] reason or no reason at all.")

---

[19] In context, it is clear that the Commonwealth did not strike prospective juror number 16 **because** she was a white female, but instead noted that this peremptory strike did not fall within Hupperterz's challenge to the Commonwealth striking minority or African American jurors.

In sum, upon our review of the certified record, the parties' briefs, the applicable law, and the well-reasoned opinion of the Honorable Judge Bronson, we find that Hupperterz is entitled to no relief. Based on the foregoing reasons, the trial court properly denied Hupperterz's motions to suppress lawfully obtained evidence, committed no abuse of discretion in its evidentiary rulings, and properly denied Hupperterz's motion for a mistrial and ***Batson*** claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/20